IN THE UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF MARYLAND, NORTHERN DIVISION

|  |  |  |
|---|---|---|
| MANUEL A. NOYA, et al., | * | |
| Plaintiffs, | * | |
| v. | * | CIVIL NO.: WDQ-13-0965 |
| FRONTIER ADJUSTERS, INC., et al., | * | |
| Defendants. | * | |

\* \* \* \* \* \* \* \* \* \* \* \* \*

MEMORANDUM OPINION

Manuel A. Noya[1] and Noya Corporation (collectively, the "Plaintiffs") sued Frontier Adjusters, Inc. ("Frontier") and various Frontier affiliates[2] (collectively, the "Defendants"), for tortious interference with existing economic relations, breach of contract, and other claims. Pending are the Plaintiffs' motions for leave to file a second amended complaint and for a preliminary injunction. No hearing is necessary. See

---

[1] The Clerk will correct the misspelling of Noya's first name, to "Manuel." See ECF Nos. 1, 7, 16-3.

[2] Frontier Adjusters of Arizona, Inc. ("Frontier Arizona"); Frontier Adjusters of America, Inc. ("Frontier America") (collectively, the "Frontier Defendants"); Merrymeeting, Inc. ("Merrymeeting"); and Marathon Management Services LLC ("Marathon"). Second Am. Compl. (The proposed Second Amended Complaint erroneously names "Marathon Management, LLC" as a defendant. See ECF No. 17 at 1. The Clerk will correct the error.) The Plaintiffs also sued John M. Davies; Jeffrey R. Harcourt; Milo Bolender; and Edward Ferrie, who are owners of-- and/or employed by--the Frontier Defendants. See Second Am. Compl. ¶¶ 7, 9-11.

Local Rule 105.6 (D. Md. 2011). For the following reasons, the Plaintiffs' motion for leave to file a second amended complaint will be granted. Their motion for a preliminary injunction will be denied.

I. Background[3]

A. The Parties

Noya is an insurance adjuster and the sole shareholder of Noya Corporation. Second Am. Compl. ¶¶ 1, 77; Noya Aff. ¶ 1. Frontier operates a franchise system comprised of hundreds of individual franchisees, each of whom owns and operates an independent insurance adjusting business. Second Am. Compl. ¶ 22. Frontier is owned by Frontier Arizona, which is owned by Frontier America. *Id.* ¶¶ 4-5, 23. Frontier America is owned by Merrymeeting, which also "owns and controls various other franchisors and . . . all aspects of Frontier." *Id.* ¶¶ 6, 24. Marathon provides management services for the Frontier Defendants. *Id.* ¶ 8. Davies is the President, CEO, and Chairman of the Board of the Frontier Defendants. *Id.* ¶ 7.[4] Harcourt is the Frontier Defendants' COO and Treasurer. *Id.* ¶ 9. Bolender is the Frontier Defendants' Senior Vice President

---

[3] The facts are from the proposed second amended complaint, the second amended complaint's supporting documents, and documents in support of the Plaintiffs' motion for preliminary injunction, the Defendants' opposition thereto, and the Plaintiffs' reply.

[4] Davies also owns 50% of Merrymeeting. Second Am. Compl. ¶ 7.

and General Manager. *Id.* ¶ 10. Ferrie is "a manager" of the Frontier Defendants and owner of an "unadvertised and secret" Frontier franchise in Tempe, Arizona. *Id.* ¶ 11.

B. Factual Background

1. The Original Agreement

On October 4, 1983, Noya and Frontier executed a Franchise Agreement (the "Original Agreement," or "the Agreement"), which granted Noya an exclusive 10-year franchise to operate an insurance adjusting business in the Baltimore, Maryland area under the Frontier name. Second Am. Compl. ¶ 80; *id.*, Ex. 2 ¶¶ 1(B), 2.1(A), 5.[5] The Agreement gave Noya "complete and absolute control in all matters involving discretion and judgment in the operation of [his] business." Second Am. Compl., Ex. 2 ¶ 10.1.[6]

---

[5] The franchise territory was shown on a map attached to the Agreement, and included areas surrounding Baltimore, Maryland, as well as Washington, DC; Arlington, Fairfax, and Alexandria, Virginia; and a portion of Prince William County, Virginia. *See* Second Am. Compl. ¶¶ 81-82; *id.*, Ex. 2 at 18. According to the Defendants, Frontier no longer issues "multiple location agreements"; instead, each location is covered by a separate agreement. ECF No. 17 at 3 n.5. The more recent franchise agreements also do not grant franchisees an exclusive geographic territory. Second Am. Compl. ¶ 36.

[6] Frontier reserved the right to "provide advertising in such form and manner as it selects." Second Am. Compl., Ex. 2 ¶ 4. The Plaintiffs characterize Frontier's advertising efforts as "minimal." *Id.* ¶ 31. Instead, Frontier's franchisees generally "perform[] their own marketing and advertising . . . and through these efforts and expenses [have grown] their individual businesses and their list of clientele." *Id.* ¶ 33. Noya has "spent a great deal of time and monetary investment

In return, Noya was required to pay Frontier 10% of his gross receipts,[7] refrain from operating a competitive insurance adjusting business during the term of the Agreement, pay all operating and business expenses, and not commit any act "prejudicial or injurious" to Frontier or other Frontier franchisees. *Id.* ¶¶ 6, 8-10. If Noya met these obligations, he was granted an option to renew the Agreement for an additional 10 years. *Id.* ¶ 5.[8]

On June 22, 1993, Noya and Frontier executed a "Modification and Extension Agreement" (the "Extension Agreement"), which extended the Original Agreement for a 10-year period beginning June 9, 1993, without material modification. *See* Second Am. Compl., Ex. 11. The Extension Agreement included one option to renew for an additional 10 years, to June 9, 2013. *See id.* ¶ 1.

On July 25, 1997, Noya and Frontier executed a "National/Regional Accounts Program Amendment" (the "Amendment"), which acknowledged Frontier's establishment of a "National/Regional Accounts Program" to "negotiate agreements with clients that

---

building my own business, including marketing my services and keeping my own clients." Noya Aff. ¶ 6.

[7] On March 31, 1986, Frontier and Noya executed an Addendum that reduced Noya's royalty fee from 15% to 10%, retroactive to October 4, 1983. *See* Second Am. Compl., Ex. 10.

[8] The Agreement also included an integration clause and choice-of-law provision. *See* Second Am. Compl., Ex. 2 ¶¶ 19-20.

require claims services on a national or regional basis." *See* Second Am. Compl., Ex. 12 ¶ 2. Under the Amendment, Frontier agreed to provide notice to Noya of a Program Agreement[9] that was "likely" to require claims services in locations covered by Noya's Original Agreement, as extended in 1993. *Id.* ¶ 3. The Amendment required Noya to provide claims services under the Program Agreement unless he, within 14 days of Frontier's notice, informed Frontier in writing of his election not to be bound. *Id.* Under the Amendment, Noya's election not to be bound would result in his office's "exclu[sion] from the list of offices eligible to receive claims services assignments under the Program Agreement." *Id*

On April 1, 2003, Noya exercised his final option to renew the Original Agreement, from June 9, 2003 to June 9, 2013. *See* Second Am. Compl. ¶ 97.[10]

### 2. The Frontier Adjusters National and Regional Customer Program ("FANRCP")

On August 13, 2009, Frontier announced implementation of the Frontier Adjusters National and Regional Customer Program

---

[9] I.e., a national or regional agreement with a client requiring claims services. *See* Second Am. Compl., Ex. 12 ¶ 3.

[10] After exercising their final renewal option for the Original Agreement, the Plaintiffs entered into 12 new franchise agreements with Frontier (the "Contemporary Agreements"), which cover "multiple" additional locations. Davies Decl. ¶¶ 5, 7. The Contemporary Agreements--none of which is in the record--will not expire until, at the earliest, 2022. *Id.* ¶ 7.

5

(the "FANRCP"). Second Am. Compl. ¶ 37.[11] In an October 14, 2009 memorandum to franchisees, Davies explained that the purpose of the program was to "develop a more effective strategy for marketing and providing service to existing and prospective national and regional customers." Id., Ex. 1 at 1. Customers who participate in the program are promised, among other things, a uniform fee structure; uniform electronic reporting and billing procedures; a uniformly "high level of service"; and the right to adjust differences with Frontier rather than each individual franchisee. Id., Ex. 3.

Franchisees who elect to participate in the FANRCP are required to sign the FANRCP Participation Agreement. Second Am. Compl., Ex. 3.[12] Under the Participation Agreement, the franchisee agrees to, inter alia, accept assignments from participating customers; comply with the terms negotiated by Frontier and the customers; and utilize "such electronic reporting methods and procedures as may be dictated." Id. Franchisees who do not sign the FANRCP Participation Agreement

---

[11] According to the Plaintiffs, the FANRCP scheme was "secretly devised" by and known to the Defendants since 2001, as evidenced by the Defendants' "put[ting] into place multiple parts and aspects" of the program before its launch, such as a call center to receive client assignments. Second Am. Compl. ¶ 41.

[12] Franchisee participation in the FANRCP is--on the face of the Participation Agreement--voluntary. See Second Am. Compl., Ex. 3 ¶ 1 ("Franchisee hereby elects to participate in the FANRCP and agrees . . .").

are ineligible to receive FANRCP customer assignments. *Id.*, Ex. 1 at 6. "Frontier, therefore, has forced franchisees to execute the Participation Agreement and modify and abrogate the terms and conditions of the franchise agreements, under the threat that Frontier has or will convert the franchisee's clients to FANRCP clients and will refuse to send further assignments from that client to that franchisee." Second Am. Compl. ¶ 60.

The FANRCP was fully implemented as of April 5, 2010. *See* Second Am. Compl. ¶¶ 37, 42. Frontier's goal is to "steadily increase" the FANRCP's business so that it accounts for 70% of total Frontier business by 2016. *Id.*, Ex. 9 at 6. According to the Plaintiffs, this change would "devastate" their business. Second Am. Compl. ¶ 43(E).[13]

3. Efforts to Resolve the Dispute

On November 1, 2012, the Plaintiffs notified Frontier of their intention to file suit over the Defendants' implementation of the FANRCP. Davies Decl. ¶ 9. The parties agreed to first attempt nonbinding mediation in Chicago. *Id.* In a November 29, 2012 email to the Plaintiffs' then-counsel, Frontier also

---

[13] In an April 11, 2011 email, Harcourt told the Plaintiffs that **"BASED UPON A QUICK REVIEW OF A FEW MONTH'S FANRCP ASSIGNMENT VOLUME, I WOULD ESTIMATE THAT YOU ARE MISSING OUT ON APPROXIMATELY 100 ASSIGNMENTS A YEAR BY ELECTING NOT TO PARTICIPATE IN THE FANRCP PROGRAM."** Second Am. Compl., Ex. 8 at 1-2 (emphasis in original). The Plaintiffs assert that "[e]very assignment lost[] is an irreplaceable loss of revenue, in an amount which cannot be fully calculated." Second Am. Compl. ¶ 70.

7

reiterated its desire to enter into new agreements for each location covered by the expiring Original Agreement. *Id.; see supra* note 5. Four days later, Noya emailed Frontier's counsel directly, stating that he had asked his attorney to close the file "in preparation to transfer th[e] case to Maryland litigation counsel." *Id.* ¶ 10. Despite this information, Frontier continued efforts to resolve the dispute, such as by flying Noya to Frontier's headquarters in Cleveland, Ohio for a day-long meeting with Davies about Noya's questions and concerns. *Id.* ¶ 11. In late January or early February 2013, Noya emailed Frontier to confirm that legal action was forthcoming. *Id.* ¶ 13. Davies sent two further communications to Noya, to which he received no response. *Id.* ¶ 14.

On April 8, 2013, the Plaintiffs sent Frontier a signed letter of intent to sell their Baltimore locations to two existing Frontier franchisees. Davies Aff. ¶ 15. On April 17, 2013, the Plaintiffs entered into--and submitted for Frontier's approval[14]--the resulting Purchase and Sale Agreement. Second

---

[14] Under the Original Agreement, Noya is prohibited from selling, transferring, assigning, leasing or subletting his interest in the Agreement without Frontier's consent and without first offering the sale to Frontier. Second Am. Compl., Ex. 2 ¶ 13. Frontier's consent "shall not be unreasonably withheld." *Id.* ¶ 13.1.

Am. Compl. ¶¶ 126-27.[15] Davies declares that Frontier has consented to the sale and waived his right of first refusal, and the buyers have "already fulfilled all of the conditions to the sale," including having executed new franchise agreements with Frontier. Davies Aff. ¶¶ 17-18.[16] On June 5, 2013, the buyers reported to Davies that they are "ready, willing and able to close," and have so advised the Plaintiffs. Id. ¶ 19.

C. Procedural History

On March 31, 2013, the Plaintiffs filed suit in this Court on the basis of diversity[17] and federal question jurisdiction.

---

[15] The Plaintiffs did not notify the buyers or Frontier that the present suit had been filed one week earlier. Davies Aff. ¶ 16; ECF No. 1.

[16] The Plaintiffs characterize Frontier's consent to the sale as conditional "at best," in that it "impos[ed] new conditions" on the franchises, including a 15% royalty rate and higher minimum quarterly billing requirements. Second Am. Compl. ¶ 127; ECF No. 20 at 18. According to Noya, these conditions rendered it "impossible" for him to proceed with the sale of the Baltimore franchise. Noya Aff. ¶¶ 9, 10.

[17] Noya is a Maryland citizen, and Noya Corporation is a Maryland corporation with its principal place of business in Maryland. Second Am. Compl. ¶¶ 1-2, 16(A)-(B). Frontier is a Colorado corporation with its principal place of business in Arizona. Id. ¶¶ 3, 16(C). Frontier Arizona and Frontier America are Arizona corporations with their principal places of business in Arizona. Id. ¶¶ 4, 5, 16(D)-(E). Merrymeeting is a Delaware corporation with its principal place of business in Ohio. Id. ¶¶ 6, 16(F). Marathon is a Delaware limited liability company with its principal place of business in Ohio. Id. ¶¶ 8, 16(H). Davies, Harcourt, and Bolender are Ohio citizens; Ferrie is a citizen of Arizona. Id. ¶¶ 7, 9-11, 16(G), 16(I)-(K). Davies is the sole member and owner of Marathon. Id. ¶ 7. The Plaintiffs seek more than $18 million in damages. Id. at 55.

9

ECF No. 1. On April 11, 2013, the Plaintiffs filed an amended complaint. ECF No. 7. On May 25, 2013, the Plaintiffs moved for a preliminary injunction. ECF No. 12. On May 28, 2013, the Plaintiffs moved for leave to file a second amended complaint. ECF No. 16.[18] On June 5, 2013, the Defendants opposed the motion for preliminary injunction. ECF No. 17. On June 6, 2013, the Plaintiffs replied in support of their motion for preliminary injunction and, alternatively, moved for a temporary restraining order ("TRO"). ECF No. 20.[19]

---

[18] The proposed second amended complaint pleads nine causes of action:
  (1) Tortious interference with existing economic relations, against Frontier (Count One);
  (2) Breach of contract, against Frontier (Count Two);
  (3) Civil conspiracy, against all Defendants (Count Three);
  (4) Business defamation, against all Defendants (Count Four);
  (5) Commercial disparagement, against all Defendants (Count Five);
  (6) "Violation of RICO Act," against all Defendants (Count Six);
  (7) Conducting or participating in a RICO enterprise, in violation of 18 U.S.C. § 1692(c), against the individual Defendants (Count Seven);
  (8) Conspiracy to violate RICO, in violation of § 1692(d), against the individual Defendants (Count Eight); and
  (9) Tortious interference with prospective business advantage, against Frontier (Count Nine).
See generally Second Am. Compl.

[19] The Court directed the Plaintiffs to file their reply by midday Thursday, June 6, 2013. See June 4, 2013 Tel. Conf. The Plaintiffs' reply was filed after 10:00 p.m., and was thus more than 10 hours late. The Court will consider the filing.

II. Analysis

A. Leave to File a Second Amended Complaint

The Plaintiffs seek leave to file a second amended complaint. ECF No. 16. The Defendants have not opposed the motion. *See* docket.[20]

Because the Plaintiffs have already amended their complaint, further amendment is possible "only with the opposing party's written consent or the court's leave." *See* Fed. R. Civ. P. 15(a)(2); *Rice v. PNC Bank, N.A.*, No. PJM-10-0007, 2010 WL 1711496, at *2 (D. Md. Apr. 26, 2010). Leave should be freely given "when justice so requires." Fed. R. Civ. P. 15(a)(2). Leave should be denied only when amendment would prejudice the opposing party, amount to futility, or reward the movant's bad faith. *Steinburg v. Chesterfield Cnty. Planning Comm'n*, 527 F.3d 377, 390 (4th Cir. 2008). Here, the Plaintiffs assert that justice requires leave to amend, in light of "[n]ew facts and developments." ECF No. 16-1.[21] Amendment is unlikely to prejudice the Defendants, who have yet to be served. *See*

---

[20] The Defendants' time to oppose the motion for leave to amend has not yet run. *See* docket.

[21] The proposed second amended complaint adds details about the Defendants' preparations for the FANRCP; the Defendants' future plans regarding the program; the effect of the program on franchisees' businesses; and the Plaintiffs' recent efforts to resolve their differences with the Defendants by selling their interest in the Original Agreement. *See generally* ECF No. 16-2.

docket. The Plaintiffs do not appear to have acted in bad faith.

Thus, the motion for leave to file a second amended complaint will be granted.

B. Preliminary Injunction

The Plaintiffs seek a preliminary injunction:

(1) barring a modification of or the attempted termination of Plaintiffs' existing franchise agreement with Defendant Frontier Adjusters;
(2) barring a modification of, impingement upon, or attempted termination of, Plaintiff's rights to provide services to his existing franchise territories (as defined and delineated in the Complaint);
(3) prohibiting the Defendants from authorizing or conducting solicitation of Noya's existing clientele for conversion to the Defendant's FANRCP program;
(4) directing Frontier to assign to Noya all client assignments received by Frontier, where the assignment is to be performed in the exclusive geographic territory granted to Noya in the Noya Original Agreement;
(5) prohibiting Frontier from assigning to other entities, or unto itself, any client assignments received by Frontier, where the assignment is to be performed in the exclusive geographic territory granted to Noya in the Noya Original Agreement;
(6) requiring Frontier to alter and amend their [sic] Uniform Franchise Offering Circular to comport with the facts regarding its ownership of franchises and its competition with its own franchisees;
(7) ordering Frontier to extend the term and terms of the Noya Original Agreement without forcing adherence to a new and onerous set of terms at the conclusion of the term of the Noya Original Agreement;
([8]) rendering null any covenants not to compete and solicit clients that purport to restrict Noya under the Noya Original Agreement;
([9]) preventing the Defendant from retaliatory and punitive acts against the Plaintiff and his franchise operations, and;

12

([10]) preventing the Defendant from taking any other action to deny Plaintiffs any of the contractual rights afforded to him under the Noya Original Agreement, or deny any services and accommodations provided to other franchisees of Frontier Adjusters under the terms in their existing franchise agreements without any changes, all of the above pending a full and final trial in this case.

ECF No. 12 at 1-2.

A preliminary injunction is an "extraordinary remed[y] involving the exercise of very far-reaching power to be granted only sparingly and in limited circumstances." *MicroStrategy Inc. v. Motorola, Inc.*, 245 F.3d 335, 339 (4th Cir. 2001) (internal quotation marks omitted). Because issuing a preliminary injunction "requires that a district court, acting on an incomplete record, order a party to act, or refrain from acting, in a certain way," "[t]he danger of a mistake in this setting is substantial." *Hughes Network Sys., Inc. v. InterDigital Commc'ns Corp.*, 17 F.3d 691, 693 (4th Cir. 1994) (internal quotation marks omitted).

"Ordinarily, preliminary injunctions are issued to protect the status quo and to prevent irreparable harm during the pendency of a lawsuit ultimately to preserve the court's ability to render a meaningful judgment on the merits." *Perry v. Judd*, 471 F. App'x 219, 223 (4th Cir. 2012) (internal quotation marks omitted). "[M]andatory preliminary injunctive relief in any circumstance is disfavored, and warranted only in the most

extraordinary circumstances." *Id.* (internal quotation marks omitted).

To obtain a preliminary injunction, the movant must demonstrate that: (1) he is likely to succeed on the merits; (2) he is likely to suffer irreparable harm absent preliminary relief; (3) the balance of equities favors him; and (4) an injunction is in the public interest.[22] The movant must show more than a "grave or serious question for litigation"; instead, he bears the "heavy burden" of making a "clear showing that [he] is likely to succeed at trial on the merits." *Real Truth*, 575 F.3d at 347, 351. All four elements must be satisfied. *Id.* at 346.

1. Likelihood of Success on the Merits

Of the nine counts in the second amended complaint, only two (breach of contract and civil conspiracy) seek injunctive relief. *See* Second Am. Compl. Further, civil conspiracy "is not a separate tort capable of independently sustaining an award of damages in the absence of other tortious injury to the plaintiff." *Lloyd v. General Motors Corp.*, 916 A.2d 257, 284 (Md. 2007) (internal quotation marks omitted). Thus, the Plaintiffs' likelihood of success on the merits of their conspiracy claim depends upon the viability of their other tort

---

[22] *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008); *Real Truth About Obama, Inc. v. Fed. Election Comm'n*, 575 F.3d 342, 346 (4th Cir. 2009), *vacated on other grounds*, 130 S. Ct. 2371 (2010), *reinstated in relevant part on remand*, 607 F.3d 355 (4th Cir. 2010) (per curiam).

causes of action. On this point, the Plaintiffs argue that they are likely to succeed on the merits because "Frontier Adjusters had no basis to terminate Plaintiffs." ECF No. 12-1 at 5. The Defendants counter that the Plaintiffs have no right to renew the Original Agreement. ECF No. 17 and 8. Accordingly, "even if Frontier were refusing to enter into new Franchise Agreements for the locations covered by the expiring Baltimore Agreement, Plaintiffs would have no legal grounds for complaining." ECF No. 17 at 8.

Contrary to the Plaintiffs' assertion, Frontier has not "terminated" them. To the extent that the Plaintiffs contest the Original Agreement's June 9, 2013 end date, the Agreement is ending by its express terms--not because of any action by Frontier. *See generally* Second Am. Compl. ¶ 97; *id.*, Exs. 2, 11. An injunction ordering the Defendants not to terminate the Agreement would expire when the Agreement does.[23] Moreover, although the Plaintiffs' *Original Agreement* may expire, their Baltimore business will be preserved, at least in part, by their agreement to sell the franchise. Davies Decl. ¶¶ 17-19.

---

[23] *Cf. Orion Sales, Inc. v. Emerson Radio Corp.*, 148 F.3d 840 (7th Cir. 1998) ("The preliminary injunction entered by the district court in this case is patently moot; the injunction ordered Emerson not to terminate the License Agreement, but the Agreement expired by its own terms on March, 31, 1998, over two months prior to the oral argument of this appeal. Thus, the relief that [appellant] seeks--dissolution of the injunction-- would have no effect, as the injunction has expired along with the Agreement.").

Finally, the Plaintiffs' remaining 12 agreements with Frontier are unaffected by the Original Agreement's expiration. *See* Davies Decl. ¶ 7. As the Plaintiffs' motion offers no other grounds for success on their claims, *see* ECF No. 12-1 at 5-6, likelihood of success is far from clear.[24]

2. Irreparable Harm

The Plaintiffs argue that their Original Agreement's impending expiration will "cause the immediate and irreparable evaporation of the Plaintiffs' [30-year] family business and all value of that business." ECF No. 12-1 at 3; *see id.* at 5. The Defendants argue that, because the expiration of the Original Agreement will not affect the duration of the 12 Contemporary Agreements, the Plaintiffs' business "can continue uninterrupted." ECF No. 17 at 11.

In addition to establishing a likelihood of success on the merits, a preliminary injunction movant must make a clear showing of irreparable harm that is "actual and imminent." *Scotts Co. v. United Indus. Corp.*, 315 F.3d 264, 283 (4th Cir. 2002) (internal quotation marks omitted). "The threat of imminent financial ruin, if legitimate, might reasonably be found to constitute *prima facie* evidence of irreparable harm."

---

[24] The Court need not consider the Defendants' additional argument that the Plaintiffs' claims are barred by "broad and all-encompassing" binding arbitration provisions in the Contemporary Agreements. ECF No. 17 at 9-11; Davies Aff. ¶ 20.

16

*Union Cosmetic Castle, Inc. v. Amorepacific Cosmetics USA, Inc.*, 454 F. Supp. 2d 62, 68 (E.D.N.Y. 2006).[25] But, "a plaintiff's undue delay in seeking injunctive protection can preclude, as a matter of law, the finding that the plaintiff will suffer irreparable harm if the provisional remedy is not granted." *Union Cosmetic Castle, Inc. v. Amorepacific Cosmetics USA, Inc.*, 454 F. Supp. 2d 62, 68 (E.D.N.Y. 2006).[26]

Only one of the Plaintiffs' 13 franchise agreements with Frontier--the Original Agreement--will expire on June 9, 2013. Davies Decl. ¶¶ 5-6. The 12 remaining agreements account for more than 40% of Noya's annual sales. Noya Supplemental Aff. ¶ 26. Moreover, the Plaintiffs have already entered into an agreement to sell the locations covered by the Original Agreement to existing Frontier franchisees. Davies Aff. ¶ 15; *see also* Second Am. Compl. ¶¶ 126-27. Frontier has consented to the sale and waived its right of first refusal, and the buyers have "already fulfilled all of the conditions to the sale," including having executed new franchise agreements with

---

[25] *See also, e.g., Tucker Anthony Realty Corp. v. Schlesinger*, 888 F.2d 969, 975 (2d Cir. 1989) (irreparable harm prong met by "ample evidence of plaintiffs' imminent bankruptcy").

[26] *See also Nassau Boulevard Shell Serv. Station v. Shell Oil Co.*, 869 F.2d 23, 24 (2d Cir. 1989) (per curiam) ("[F]ranchisees seeking preliminary relief in disputes with their franchisors should move for such relief within a reasonable time after notice of termination of their franchise agreements . . . . If they do not do so, they should be prepared to suffer the loss of their businesses while they litigate the merits.").

Frontier. Davies Aff. ¶¶ 17-18. As of June 5, 2013, the buyers reportedly were "ready, willing and able to close." Id. ¶ 19. Thus, the Plaintiffs have not clearly shown that expiration of the Original Agreement poses a legitimate threat of imminent financial ruin.

Even if the Plaintiffs had shown imminent irreparable harm, preliminary injunctive relief would be inappropriate in light of the Plaintiffs' considerable delay in seeking it. The Plaintiffs have known of the Original Agreement's expiration since they exercised their final renewal option on April 1, 2003. See Second Am. Compl. ¶ 97. The FANRCP, which gave rise to the Plaintiffs' claims, was announced on August 13, 2009, and had been fully implemented as of April 5, 2010. See id. ¶¶ 37, 42. The Plaintiffs filed suit almost three years later, on March 31, 2013, ECF No. 1, and waited an additional seven weeks before seeking preliminary injunctive relief, ECF No. 12.[27] Equity requires the Plaintiffs to "be prepared to suffer the loss of their business while they litigate the merits." *Nassau Boulevard Shell Serv. Station*, 869 F.2d at 24.

---

[27] The Plaintiffs explain that they delayed filing suit to "avoid the consequences that a lawsuit would have on their relationship with Defendants," and--upon filing suit--delayed effecting service "to avoid the negative impact the suit might have on the consent of Defendants to the sale [of the Original Agreement]." ECF No. 20 at 2. That the Plaintiffs' decision to delay suit was in good faith does not change the Court's analysis.

18

The Plaintiffs are not entitled to a preliminary injunction because they have not shown a clear likelihood of success on the merits, or irreparable harm that is actual and imminent.[28] Their motion for a preliminary injunction will be denied.[29]

III. Conclusion

For the reasons stated above, the Plaintiffs' motion for leave to file a second amended complaint will be granted, and their motion for preliminary injunction will be denied.

_____6/7/13_____          _____/s/_____
Date                              William D. Quarles, Jr.
                                  United States District Judge

---

[28] Because the Plaintiffs have not shown irreparable harm, this Court need not balance the equities or address whether an injunction is in the public interest. See Real Truth, 575 F.3d at 346.

[29] To the extent that the Plaintiffs seek a TRO, see ECF No. 20 at 1, the motion will be denied for the same reasons. See, e.g., Montgomery v. Housing Auth. of Balt. City, 731 F. Supp. 2d 439, 441 (D. Md. 2010) (the standard for granting a TRO under Fed. R. Civ. P. 65(b) is the same as that for a preliminary injunction); Ficker v. Tuohy, 305 F. Supp. 2d 569, 571 (D. Md. 2004) (same).